ROBERT L. VESCO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vesco v. Commissioner
Docket No. 8872-73.
United States Tax Court
T.C. Memo 1979-369; 1979 Tax Ct. Memo LEXIS 154; 39 T.C.M. (CCH) 101; T.C.M. (RIA) 79369; September 11, 1979, Filed; As Amended October 17, 1979 Myles J. Sachs,Robert D. Foglia, and Joseph A. Foglia, for the petitioner. Agatha L. Vorsanger,William J. Salica,Bernard S. Mark and Joseph T. Chalhoub, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1971 *155 in the amount of $775,310 and an addition to tax under section 6653(a), I.R.C. 1954, [1] in the amount of $38,765.50. The issues for decision are: (1) Whether respondent's determination of deficiency in this case is arbitrary and capricious; (2) whether petitioner, who since February 1973 has continuously resided outside the United States, should be denied a redetermination of his tax liability for 1971 by this Court because he was indicted in June and July 1973 in three separate indictments by a Federal Grand Jury on felony charges and at a later time indicted for willfully disobeying and resisting a subpoena, all in the Southern District of New York; (3) whether petitioner received income in the amount of $830,729.69 or any part thereof in 1971 by reason of his personal use for himself and for his family of a 707 aircraft owned by a corporate subsidiary of the corporation of which he was an officer; (4) whether petitioner received income of $170,621.06 or any part thereof from payments and advances made to him or for his benefit during 1971 *156 by the corporation of which he was an officer; (5) whether petitioner received income of $28,170.58 or any part thereof during 1971 represented by unexplained deposits into his bank account at the American National Bank and Trust Company, Morristown, New Jersey; (6) whether petitioner is entitled to a claimed long-term capital loss in 1971 and capital loss carryover from 1970 to 1971 as a result of loans to or investments in certain foreign entities; and (7) whether petitioner is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, at the time of the filing of his petition in this case, resided in Nassau, N.P., Bahamas and San Jose, Costa Rica. Robert L. Vesco (petitioner) and his wife, Patricia J. Vesco, filed a joint Federal income tax return for the calendar year 1971 with the District Director of Internal Revenue, Newark, New Jersey. At the time of filing this return, petitioner and Mrs. Vesco resided on Old Denville Road, Boonton, New Jersey. During the entire calendar year 1971, petitioner was employed *157 by International Controls Corporation (ICC) and served as the chairman of its board of directors and chief executive officer. ICC is a Florida corporation which had its principal place of business during 1971 in Fairfield, New Jersey. It was engaged in various diversified business enterprises and had plants and offices throughout the United States. Its common stock was listed on the American Stock Exchange. During 1971 the board of directors of ICC consisted of the following: Frank G. Beatty, Richard E. Clay, Stanley Hiller, Jr., Ralph P. Dodd, Malcolm E. McAlpin, Laurence B. Richardson, Jr., Wilbert J. Snipes, Merle Thorpe, Jr., Robert L. Vesco On August 31, 1970, ICC Investments, Ltd. (IIL), a subsidiary of ICC, entered into an agreement to purchase $5 million of promissory notes and stock warrants of Investors Overseas Services, Ltd. (IOS), a Canadian corporation. IOS was effectively a holding company which either directly or through subsidiaries had its principal offices in or near Geneva, Switzerland and had other offices or operations scattered throughout the world. Under the terms of the agreement dated August 31, 1970, with respect to financing entered into between *158 ICC and IOS, ICC was entitled to designate two members of the board of directors, the finance committee and the executive committee of IOS. During the year 1971, petitioner and Milton S. Meissner were the directors and members of the finance and executive committees of IOS designated by ICC. During the year 1971, ICC, through a wholly owned foreign subsidiary, IIL, had an investment in IOS which amounted to 38 percent of the voting stock of IOS and constituted effective control of IOS. Around February of 1971 petitioner became chairman of the board of IOS. In late 1970 and early 1971, IOS defaulted with respect to certain of the provisions of the agreement dated August 31, 1970, and because of these defaults ICC effectively obtained the authority to make appointments of officers in the subsidiary companies of IOS. The various subsidiaries of IOS had interests in the fields of real estate, mutual funds, banking institutions and insurance companies. One subsidiary of IOS, through management contracts, managed numerous foreign mutual funds with assets of over $200 million. Another IOS subsidiary sold to the public nonvoting shares in the mutual funds that were managed by the *159 other IOS subsidiaries. Other subsidiaries controlled various foreign insurance companies, banks and real estate companies. In 1970, prior to entering into the agreement of August 31, 1970, petitioner and Mr. Meissner, with the assistance of other officers and employees of ICC, attorneys and accountants, had spent several months in Geneva, Switzerland investigating the financial condition and operations of IOS. After petitioner's appointment to the board of directors of IOS, and particularly after he became chairman of that board, he spent time working on the affairs of IOS. ICC and IOS entered into an agreement that expenses incurred by petitioner on behalf of IOS and paid by ICC would be reimbursed to ICC by IOS. Prior to June 1971, ICC had owned a two-engine Gulfstream G-1 airplane which had been used to fly various ICC executives and their business associates to various business appointments. In late 1970 and early 1971 this Gulfstream G-1 plane was used on occasions for transatlantic flights. The pilots employed by ICC complained that the use of the Gulfstream G-1 for transatlantic flights was unsafe and one copilot resigned his position because of being asked to fly *160 this plane on transatlantic flights. In addition to being unsafe, the transatlantic flights took from 12 to 15 hours. By early 1971, because of the time spent by various executives of ICC in connection with the affairs of IOS, more transatlantic flights of these executives were required. Commercial airline service was not always adequate transportation for these officers for their various overseas appointments. The problems of the unsuitability of the Gulfstream G-1 for transatlantic flights and the inadequacy on occasion of commercial airline service were discussed at several ICC board meetings. Mr. Ralph Dodd, an officer of ICC, was directed to search for a plane for ICC which would have the range, speed and capabilities of overseas flights and have sufficient seating capacity for moving a number of people in a reasonable time over long distances. After comparing various aircraft, both with respect to price, operating costs and range, and having the various planes checked out by the ICC chief pilot, Nick Eisenhauer, Mr. Dodd determined that the best plane for the use of ICC which he had seen was a 10-to-12-year-old Boeing 707 which could be acquired from Pan American Airlines *161 for $1,375,000. The Boeing 707 was more expensive to operate than a Gulfstream G-2 or comparable plane. However, the Gulfstream G-2 or comparable-sized plane which would carry only about 12 people and had a range from New Jersey no further than London would cost approximately $4 million. During 1971, ICC had a wholly owned subsidiary, Fairfield General Corporation, and this corporation had a wholly owned subsidiary, Skyways Leasing Corporation. In late April or early May of 1971, Skyways Leasing Corporation purchased the used Boeing 707 which had been located by Mr. Dodd and leased the plane to ICC. Between the time that the Boeing 707 was acquired by the subsidiary of ICC and the early part of June 1971, the crew of the plane was in training first by representatives of Pan American and then on their own. The 707 airplane cost about $2,000 an hour to operate, but it could fly across the Atlantic in about four hours. The following schedule shows the expenses attributable to the 707 for the period June 1 through September 30, 1971, as shown on the records of ICC: June, July, August and September 1971: Pilot and crew payroll
$ 33,652
Employee benefits
8,469
Pilot training
16,950
Maintenance and repairs
45,220
Line service
9,618
Landing fees
5,306
Gas and oil
119,550
Travel expense
21,328
Depreciation
31,125
Insurance
47,343
Aircraft catering
1,368
Navigation
224
Security guards
158
Telephone
675
*162 Beginning in October of 1971, after an actual lease agreement between Skyways Leasing Corporation and ICC was signed, ICC paid a monthly rental of $100,000 for the 707 and in addition paid the salaries of the crew and the upkeep of the plane. The following schedule shows the total expenditures on the 707 as shown on the books of ICC for the months of October, November and December of 1971: October, November and December 1971: Rental
$100,000.00
$100,000.00
$100,000.00
Crew's salaries
9,080.50
9,078.10
7,164.50
Crew expenses
8,787.85
8,188.81
7,322.74
Gas and oil
30,319.23
19,624.24
8,718.02
Ground service
15,826.80
2,086.69
550.00
Landing fees
2,672.69
1,193.03
516.82
Repairs and maintenance
(including reserves for
engine overhaul)
31,616.30
27,054.37
8,888.00
Miscellaneous
170.36
852.00
32.80
Total
$198,473.73
$168,077.24
$123,192.88 *
The total cost of operation of the Boeing 707 from June 1 through December 30, 1971, as reflected on the books of ICC was $830,729.69. All but $68,000 of this amount was reimbursed to ICC by IOS. This reimbursement was pursuant to an agreement *163 made between ICC and IOS under which the 707 would be used in connection with IOS business, and IOS would reimburse ICC for this use rather than purchasing an airplane for its own use, which it had been considering. The following schedule is a summary from the logs of the Boeing 707 beginning June 16, 1971, showing the flight number, date of the flight, place of departure, place of arrival and passengers: No.
Date
Departure
Arrival
Passengers
1
6/16/71
Miami
Newark
0
2
6/17/71
Newark
JFK
0
3
6/17/71
JFK
Paris
0
4
6/18/71
Paris
Geneva
Robert L. Vesco, Dr.
Milton Meissner
5
6/19/71
Geneva
Amsterdam
Robert L. Vesco, Mrs.
Pat Vesco, Shirley Bailey,
Danny, Tony and Robert Vesco, Charley Fabel
6
6/21/71
Amsterdam
Geneva
Robert L. Vesco, Mrs.
Pat Vesco, Shirley Bailey,
Dawn, Danny and Tony
Vesco, Charley Fabel, Richard
Clay, Carol Bartlett
7
6/21/71
Geneva
Frankfurt
0
8
6/22/71
Frankfurt
Geneva
0
9
6/24/71
Geneva
Frankfurt
0
10
6/25/71
Frankfurt
Geneva
0
11
6/27/71
Geneva
Newark
Robert L. Vesco, Mrs.
Pat Vesco, Dr. Milton
Meissner, Richard Clay,
Harold Kaplan
12
6/28/71
Newark
Toronto
Robert L. Vesco, Howard
Cerny, Mr. Buhl, Mrs.
Pat Vesco, Ralph Dodd, Dr. Milton
Meissner, Mr.
R. Merritt, Mr. J.
D'Alimente, Richard Clay
13
6/28/71
Toronto
Newark
0
14
6/30/71
JFK
Toronto
0
15
7/1/71
Toronto
Rome
Robert L. Vesco, Mrs.
Pat Vesco, Dr. Milton
Meissner, Robert Slater,
Malcolm Fox
16
7/3/71
Rome
Geneva
Robert L. Vesco, Mrs.
Pat Vesco, Tony and Robert
Vesco, Charley Fabel
17
7/9/71
Geneva
Munich
Robert L. Vesco, Mrs.
Pat Vesco, Dr. and Mrs. M.
Meissner, Mr. and Mrs.
K. Beaugrand, Mr. M. Fox,
Mr. R. Fiora, Mr. R.
Fell, Mr. B. Shaltzman
18
7/9/71
Munich
Geneva
Robert L. Vesco, Mrs.
Pat Vesco, Dr. and Mrs.
Meissner, Mr. R. Fell,
B. Shaltzman, Mr. M. Fox
19
7/13/71
Geneva
Frankfurt
Robert L. Vesco, Dr.
M. Meissner
20
7/13/71
Frankfurt
Munich
Robert L. Vesco, Dr.
M. Meissner
21
7/15/71
Munich
Geneva
Robert L. Vesco, Dr.
M. Meissner
22
7/15/71
Geneva
Bangor, Me.
Robert L. Vesco, Mrs.
Pat Vesco, Dr. Milton
Meissner, Shirley Bailey,
Norman LeBlanc, Marvin
Hoffman, Anthony Phillips,
Steve Patton, Ken
Beaugrand
23
7/15/71
Bangor, Me.
Newark
0
24
7/16/71
Newark
Bangor, Me.
0
25
7/16/71
Bangor, Me.
Geneva
Robert L. Vesco, Mrs.
Pat Vesco, Shirley Bailey,
Sherwin Markman, Marvin
Hoffman, Mr. Chusdik, Ken
Beaugrand, Anthony
Phillips, Dr. Milton Meissner,
Norman LeBlanc
26
7/19/71
Geneva
Newark
0
27
7/20/71
Newark
Gander
Ralph Dodd, Messrs. W.
Snipes, M. McAlpin, S.
Hiller, L. Richardson,
R. Jeffers, R. Odle, Mrs.
S. Hiller, Mrs. R. Jeffers,
Mrs. M. McAlpin
28
7/20/71
Gander
Geneva
Ralph Dodd, Messrs. W.
Snipes, M. McAlpin, S.
Hiller, L. Richardson,
R. Jeffers, R. Odle, Mrs.
S. Hiller, Mrs. R. Jeffers,
Mrs. M. McAlpin
29
7/24/71
Geneva
London
Robert L. Vesco,
Richard Clay
30
7/24/71
London
Geneva
Robert L. Vesco
31
7/25/71
Geneva
London
Robert L. Vesco, Mrs.
Pat Vesco, Robbie Batton,
Mrs. Milton Meissner,
Tony, Robert, Danny and
Dawn Vesco, Carol Bartlett,
Shirley Bailey,
Charley Fabel
32
7/28/71
London
Newark
Robert L. Vesco, Mrs.
Pat Vesco, Robbie Batton,
Mrs. Milton Meissner,
Tony, Robert, Danny and
Dawn Vesco, Carol Bartlett,
Shirley Bailey,
Charley Fabel, Vivian
Tausk
33
8/1/71
Newark
Gander
Robert L. Vesco, Mrs.
Pat Vesco, Marilyn Beatty,
Vivian Tausk
34
8/1/71
Gander
Geneva
Marilyn Beatty, Vivian
Tausk, Robert L. Vesco,
Mrs. Pat Vesco
35
8/5/71
Geneva
Nassau
Robert L. Vesco
36
8/9/71
Nassau
Geneva
Robert L. Vesco
37
8/12/71
Geneva
Luxemburg
Robert L. Vesco
38
8/12/71
Luxemburg
Geneva
Robert L. Vesco
39
8/16/71
Geneva
Newark
0
40
8/25/71
Newark
Dulles
Robert L. Vesco, Frank
Beatty, Ken Beaugrand
41
8/25/71
Dulles
London
Robert L. Vesco, Frank
Beatty, Ken Beaugrand
42
8/27/71
London
Geneva
Robert L. Vesco,
Richard Clay
43
8/28/71
Geneva
Newark
Robert L. Vesco, Richard
Clay, Frank Beatty
44
8/31/71
Newark
Dulles
Robert L. Vesco, Sherman
Markman
45
8/31/71
Dulles
Newark
Robert L. Vesco
46
9/2/71
Newark
Las Vegas
Robert L. Vesco, Ralph
Lambreglia, Howard
Milligan, John Delsaro,
Larry Richardson, Mrs.
Betty Richardson, Mrs.
Pat Vesco, Ralph Dodd
47
9/2/71
Las Vegas
Newark
Robert L. Vesco, Mrs.
Pat Vesco, Howard Milligan,
John Delsaro, Larry
Richardson, Mrs. Betty
Richardson, Ralph Dodd,
Morris Shenker
48
9/7/71
Newark
Washington
Robert L. Vesco, Larry
Richardson, Merle Thorpe,
Richard Clay, Frank Beatty
49
9/7/71
Washington
Geneva
Robert L. Vesco, Richard
Clay, Paul Gilbert,
Gilbert Straub
50
9/10/71
Geneva
Newark
Robert L. Vesco, Richard
Clay, Paul Gilbert
51
9/12/71
Newark
Chicago
Robert L. Vesco, Merle
Thorpe, Frank Beatty,
Larry Richardson
52
9/12/71
Chicago
San Diego
Robert L. Vesco, Frank
Beatty, Larry Richardson,
Donald Peters, Sol Schwartz,
June Franks, Lynne
Dorfman, Jeanne Dachman,
Robert Dachman, Marilyn
Schwartz, Irwin Weiner,
Perry Franks, Rose Dorfman,
Allen Dorfman Merle
Thorpe
53
9/13/71
San Diego
Newark
Robert L. Vesco, Merle
Thorpe, Frank Beatty, Larry
Richardson
54
9/18/71
Newark
Nassau
Robert L. Vesco, Pat
Vesco, Dr. and Mrs. Milton
Meissner, Frank Beatty,
Mr. and Mrs. Richard Clay,
Mr. and Mrs. Anthony
Phillips, Mr. and Mrs. Roy
Merritt, Mr. and Mrs.
John D'Alimante, Ms. Robby Batton
55
9/18/71
Nassau
San Diego
0
56
9/19/71
San Diego
Chicago
Howard Cerny, Mr. and
Mrs. Joseph Bernstein,
Joseph Powers, Robert
Kulowitz, Sam Karloy,
Melvin Waldorf, Mr.
and Mrs. Allen Dorfman, Mr.
and Mrs. Perry Franks,
Mr. and Mrs. Jay Dorfman,
Mr. and Mrs. Robert
Dachman, Mr. and Mrs. George
Dreske, Ken Dreske,
Irwin Weiner, George Jacobs
Meyer, Jane Jacobs
Meyer, Mr. and Mrs. Ray McCurdy,
Mrs. Mary Johnson
57
9/19/71
Chicago
Midland
Howard Cerny
58
9/19/71
Midland
Miami
0
59
9/19/71
Miami
Nassau
0
60
9/22/71
Nassau
Newark
Robert L. Vesco, Mrs.
Pat Vesco, Mrs. Catherine
Franco, Mr. and Mrs.
Allen Conwill, Ms. Robbie
Batton, Mrs. Eloise
Clay, Tim Hawkins, Frank
Beatty, Norman LeBlanc,
Peter Watt, Merle Thorpe,
Mrs. Lollie Meissner,
William Haggerty
61
9/23/71
Newark
Orlando
Robert L. Vesco,
Howard Cerny
62
9/23/71
Orlando
Newark
Robert L. Vesco,
Howard Cerny
63
9/27/71
Newark
Bangor, Me.
Robert L. Vesco, Richard
Clay, Mrs. Lollie Meissner,
Norman LeBlanc, Fred Weymar, Ulrich Strickler,
Howard Paley, Kenneth
Furst, Larry Collins
64
9/28/71
Bangor, Me.
Geneva
Robert L. Vesco,
Richard Clay, Mrs. Lollie
Meissner, Norman
LeBlanc, Fred Weymar, Ulrich
Strickler, Howard
Paley, Kenneth Furst, Larry
Collins
65
9/30/71
Geneva
Newark
Robert L. Vesco,
Kenneth Furst, Mr. and Mrs. Fred
Weymar, Mr. and Mrs.
Ken Beaugrand, Lang Keith, Mrs.
Sophie Dluzniewski,
James Rosenhauer
66
10/5/71
Newark
JFK
0
67
10/5/71
JFK
Geneva
Robert L. Vesco,
Mrs. Pat Vesco, Walter Ebert,
Shirley Bailey, Richard
Clay, Regina Cahill, Mr.
and Mrs. Fred Weymar,
Mr. and Mrs. Ken Beaugrand,
Miss Robbie Batton,
Jean Pierre Aubert
68
10/10/71
Geneva
London
Robert L. Vesco
69
10/11/71
London
Geneva
Robert L. Vesco
70
10/12/71
Geneva
Rome
Robert L. Vesco
71
10/12/71
Rome
Geneva
Robert L. Vesco
72
10/13/71
Geneva
Newark
Robert L. Vesco
73
10/14/71
Newark
Nassau
Robert L. Vesco,
Ralph Dodd
74
10/15/71
Nassau
Newark
Robert L. Vesco,
Ralph Dodd
75
10/21/71
Newark
Nassau
Robert L. Vesco,
Ken Beaugrand, Dr. Milton Meissner,
Mr. and Mrs. Allen
Conwill, Mrs. Catherine France,
Ralph Dodd, John
Johnidis, Ray Merritt, Gary Ford,
Anthony Phillips, Marvin Hoffman,
John D'Alimante,
Kevin Charles, Richard
Clay, Gilbert Bennett,
Norman LeBlanc,
Frank Beatty
76
10/23/71
Nassau
Newark
Robert L. Vesco,
John D'Alimante, Gilbert Bennett,
Ken Beaugrand, John
Schuyler, Antony Phillips, Ray
Merritt, Guy Higsen,
Kevin Charles, Ken Klein, Norman
LeBlanc, Dr. Milton
Meissner, Gary Ford, John Johnidis
77
10/24/71
Newark
JFK
Nick Eisenhauer
78
10/24/71
JFK
Geneva
Robert L. Vesco,
Richard Clay, Frank Beatty, Mrs.
Mary Wachenfeld,
John Johnidis, Mrs. Stacey
Dloznicwski, Ken
Klein, Norman LeBlanc, Nick
Eisenhauer, John
D'Alimante
79
10/28/71
Geneva
Paris
Robert L. Vesco,
Dr. Milton Meissner, Norman LeBlanc,
Miss Deborah LeBlanc,
Nick Eisenhauer
80
10/28/71
Paris
Luxemburg
Robert L. Vesco,
Dr. Milton Meissner, Norman LeBlanc,
Nick Eisenhauer
81
10/28/71
Luxemburg
London
Robert L. Vesco,
Dr. Milton Meissner, Norman LeBlanc,
Nick Eisenhauer
82
10/29/71
London
Newark
Robert L. Vesco,
Richard Clay, Arthur Lipper, III,
Sherwin Markman,
John D'Alimante, Nick Eisenhauer
83
11/3/71
Newark
Jacksonville
Robert L. Vesco,
Richard Clay, Ralph Dodd, Jack
Pruitt, Buddy Foster
84
11/3/71
Jacksonville
Washington
Robert L. Vesco,
Richard Clay, Ralph Dodd, Edward Ball
85
11/3/71
Washington
Newark
Robert L. Vesco,
Richard Clay, Ralph Dodd
86
11/7/71
Newark
JFK
Robert L. Vesco,
Mrs. Pat Vesco, Richard Clay,
Frank Beatty, Howard
Cerny, Sherwin Markman,
Michael Targoff
87
11/7/71
JFK
Geneva
Robert L. Vesco,
Mrs. Pat Vesco, Richard Clay, Frank
Beatty, Howard Cerny,
Sherwin Markman, Michael
Targoff, Miss Theresa
Cahill, Miss Eileen Cahill,
William Cahill
88
11/9/71
Geneva
Beirut
Robert L. Vesco,
Mrs. Pat Vesco, Dr. Hanspeter
Brunner, Gilbert
Straub, Barbara Rossner
89
11/11/71
Beirut
Damascus
Robert L. Vesco,
Mrs. Pat Vesco, Dr. Hanspeter Brunner
90
11/11/71
Damascus
Bombay
Robert L. Vesco,
Mrs. Pat Vesco, Dr. Hanspeter Brunner
91
11/11/71
Bombay
Bangkok
Robert L. Vesco,
Mrs. Pat Vesco, Dr. Hanspeter Brunner
92
11/14/71
Bangkok
Singapore
Robert L. Vesco,
Mrs. Pat Vesco
93
11/16/71
Singapore
Hong Kong
Robert L. Vesco,
Mrs. Pat Vesco
94
11/18/71
Hong Kong
Osaka
0
95
11/21/71
Osaka
San Francisco
Robert L.
Vesco, Mrs. Pat Vesco
96
11/21/71
San Francisco
Monterey
Robert L.
Vesco, Mrs. Pat Vesco
97
11/22/71
Monterey
Las Vegas
Robert L.
Vesco, Mrs. Pat Vesco
98
11/22/71
Las Vegas
Newark
Robert L.
Vesco, Mrs. Pat Vesco
99
11/23/71
Newark
Dallas
0
100
12/23/71
Dallas
Jacksonville
Jack Pruitt
101
12/23/71
Jacksonville
Newark
Jack Pruitt,
Robert L. Vesco
102
12/26/71
Newark
Gander
Robert L. Vesco,
Mrs. Pat Vesco, Dawn, Tony,
Bobby and Danny
Vesco, Charley Fabel, Shirley
Bailey, Jim Gilbert,
Joe Sozio
103
12/26/71
Gander
Beirut
Robert L. Vesco,
Mrs. Pat Vesco, Dawn, Tony,
Bobby and Danny
Vesco, Charley Fabel, Shirley
Bailey, Jim Gilbert,
Joe Sozio
104
12/28/71
Beirut
Cairo
Robert L. Vesco,
Mrs. Pat Vesco, Dawn, Tony,
Bobby and Danny
Vesco, Charley Fabel, Shirley
Bailey, Jim Gilbert
105
12/28/71
Cairo
Nairobi
Robert L. Vesco,
Mrs. Pat Vesco, Dawn, Tony,
Bobby and Danny
Vesco, Charley Fabel, Shirley
Bailey, Jim Gilbert
*164 Mr. Dodd, as vice president of ICC, was in charge of the movement of the Boeing 707 and other matters relating to the plane. When petitioner wished to use the plane, he would check as to the availability of the plane and crew with Mr. Dodd. He would let Mr. Dodd know how many persons would be aboard the plane and what meals they might need, and Mr. Dodd would have the necessary arrangements made through his office. The plane was availabe for petitioner's use at his discretion and except under such circumstances as unavailability of the pilot or servicing of the plane petitioner used the plane at his own discretion and was not required to obtain the approval of anyone for use of the plane. In 1970, Mrs. Vesco discussed with her husband the fact that she did not like being left at home while he was constantly traveling. He suggested that she might accompany him on some of his trips. During the period June 1 through December 30, 1971, Mrs. Vesco accompanied petitioner on at least 20 trips on the Boeing 707. On these trips Mrs. Vesco's activities were purely personal and she did not engage in any business activities for either ICC or any of its related corporations or businesses. *165 Petitioner's children and his children's friends, Charley Fabel, Jim Gilbert and Joe Sozio, accompanied petitioner on several trips on the Boeing 707 during the last six months of 1971. When petitioner's children and their friends accompanied petitioner on these trips, their activities were purely personal. On the trips on which she accompanied petitioner, Mrs. Vesco would go shopping or sightseeing and when the children were also on the trip she would take them sightseeing. Flights 1 and 2, as shown on the log of the plane as above set forth, were for purposes of bringing the plane to Newark after training of its crew and having the plane serviced at JFK Airport. At the time Flight 3 of the plane occurred, petitioner and Mr. Meissner were in Paris, France. Mr. Meissner, who had his undergraduate and masters degrees in Science and as a Rhodes Scholar had received the equivalent of a Ph.D. at Oxford in Physics, had become a consultant of ICC in the summer of 1970. Prior to that time he had extensive experience as an officer in large corporations as well as in technical scientific fields. In late 1971, Mr. Meissner became president of IOS. He and petitioner, prior to June 18, 1971, had *166 been at a meeting in Paris with the senior officer of Bank Rothschild and Bank Rothschild Expansion Fund, both of which were subsidiaries of IOS. At that time the officers of Bank Rothschild represented that they wanted to be disassociated with the name IOS and this matter had been discussed. Also, a discussion had been held with respect to the use of the money of Bank Rothschild Expansion Fund, which was a French mutual fund. Mr. Meissner and petitioner had had a number of discussions in the office of the senior officer of Bank Rothschild in Paris. On June 18, 1971 (Flight 4), Mr. Meissner and petitioner flew on the Boeing 707 from Paris to Geneva and on June 19, 1971 petitioner flew on the 707 to Amsterdam, returning to Geneva on June 21, 1971 (Flights 5 and 6). While in Amsterdam during the period June 19 to June 21, 1971, petitioner and another representative of IOS discussed with certain officials of Holland the possibility of making banking arrangements in Holland. Mrs. Vesco and petitioner's children and their friends who were also on the trip went sightseeing while in Amsterdam. Mr. Richard Clay and Mr. Harold Kaplan, who were aboard Flight 11 on June 27, 1971, from *167 Geneva to Newark, together with petitioner, Mrs. Vesco and Mr. Meissner, were employees of ICC and of IOS, respectively. Mr. Kaplan was the IOS public relations officer and handled publicity and helped in preparing stockholders reports and proxy material. On June 28, 1971, a stockholders meeting of IOS was to be held in Toronto, Canada. During the flight from Geneva to Newark, petitioner, Mr. Clay, Mr. Meissner and Mr. Kaplan generally discussed the matters that would come up at the stockholders meeting and how to handle press releases after the meeting. Flight 12 on June 28, 1971, from Newark to Toronto carried a number of passengers to the IOS stockholders meeting. Mr. Robert Slater, who was with petitioner, Mrs. Vesco and Mr. Meissner on Flight 15 on July 1, 1971, from Toronto to Rome, was president of IOS and Mr. Malcolm Fox, who was on that flight, was the sales representative of IOS in Hong Kong and the owner of approximately one million shares of IOS stock. He was a member of the board of directors of IOS. While in Rome, Mr. Slater, Mr. Meissner and petitioner met with a Mr. Capone, president of IMI, which was an Italian government-owned investment corporation. At this *168 time IMI was negotiating for the purchase of one-half of Funds Italia, which was an affiliate of IOS. The discussions were primarily about price and took approximately an hour and one-half.Funds Italia was an Italian entity owned entirely by IOS. It had been a very successful Italian mutual fund. Subsequently Mr. Slater negotiated the sale of 50 percent of Funds Italia to IMI. While in Rome petitioner met his children who had been vacationing in Greece with Ms. Shirley Bailey, and his children flew back to Geneva with petitioner and Mrs. Vesco on the 707 on Flight 16. Ms. Bailey was the secretary of ICC and also served as petitioner's personal secretary. Ms. Bailey was also a friend of Mrs. Vesco's and the Vesco children. Flight 17 was a flight from Geneva to Munich and return to Geneva on the same day (Flight 18). While in Munich, petitioner, Mr. Meissner and certain representatives of IOS met with officials of Orbis Bank, which was owned by IOS, and with an individual who was in charge of Investors Funds to discuss a problem with respect to Credit Suisse. On Flight 19, petitioner and Mr. Meissner flew from Geneva to Frankfurt on July 13, 1971, and met with officials of *169 Berliner Bank to discuss the possibility of that bank being a depository bank for certain mutual funds owned by IOS known as the Dollar Funds. On the same day petitioner and Mr. Meissner flew to Munich (Flight 20) and met with officials of Orbis Bank and Investors Funds and again discussed the Credite Suisse problem. Mr. Meissner and petitioner returned to Geneva from Munich on July 15, 1971, on Flight 21. [2] On July 24, 1971, Mr. Clay, a director of ICC, and petitioner flew to London on the 707 (Flight 29). While in London, Mr. Clay and petitioner met with Mr. Edward DuCann to discuss the sale of ILI-UK, which was an affiliate of IOS. They also had a meeting with officials of a London bank to discuss a depository bank for an IOS affiliate. On the same day, July 24, petitioner as the only passenger returned from London to Geneva on the 707 (Flight 30). On July 25, 1971, petitioner, Mrs. Vesco, Mrs. Meissner, the Vesco children and their friend Charley Fabel, Ms. Shirley Bailey and two persons by *170 the name of Robbie Batton and Carol Bartlett flew aboard the 707 from Geneva to London (Flight 31). While in London, Mrs. Vesco, Ms. Bailey and the Vesco children went sightseeing and shopping. Petitioner, along with Mr. Meissner, had meetings with persons connected with IOS and ILI-UK and attended an ILI-UK board meeting. On July 28, 1971, petitioner, Mrs. Vesco, Mrs. Meissner, the Vesco children and their friend Charley Fabel, Ms. Bailey, Robbie Batton, Carol Bartlett and Vivian Tausk flew on the 707 from London to Newark (Flight 32). On August 1, 1971, petitioner, Mrs. Vesco, Marilyn Beatty and Vivian Tausk were flown aboard the 707 from Newark to Geneva with a stop in Gander. (Flights 33 and 34). On August 5, petitioner was the only passenger on a flight of the 707 from Geneva to Nassau (Flight 35). IOS had an affiliate in Nassau, International Bancorp Ltd. (IBL). On August 9, 1971, petitioner was the only passenger on the 707 from Nassau to Geneva (Flight 36). He was also the only passenger on a flight on August 12, 1971, from Geneva to Luxemburg (Flight 37), and on the flight on the same date returning from Luxemburg to Geneva (Flight 38). IOS had an affiliate in Luxemburg. *171 On August 25, petitioner, Frank Beatty and Ken Beaugrand flew aboard the 707 from Dulles to London (Flight 41) where they attended a board meeting of the ILI-UK. On August 27, petitioner and Mr. Clay flew aboard the 707 from London to Geneva (Flight 42), and on August 28, petitioner, Mr. Clay and Mr. Beatty flew from Geneva to Newark (Flight 43). On September 2, petitioner and other representatives of ICC and other persons flew aboard the 707 from Newark to Las Vegas and returned to Newark the same day (Flights 46 and 47). While in Las Vegas, petitioner and the other ICC representatives had a meeting with the trustees of a pension fund to discuss a possible loan by the fund to ICC. On September 12, 1971, petitioner and other officers and directors of ICC flew from Newark to San Diego with a stopover in Chicago to take aboard certain representatives of a pension fund (Flights 51 and 52). In San Diego, the ICC representatives held a meeting with representatives of a pension fund with respect to a possible loan by the fund to ICC. On September 13, petitioner and other ICC officials flew aboard the 707 from San Diego to Newark (Flight 53). On September 18, petitioner, Mrs. Vesco, *172 other members of the board of directors of IOS and other ICC officials, together with their wives, were flown on the 707 from Newark to Nassau (Flight 54). In Nassau, petitioner and other officials of ICC attended board meetings of IOS, Global Natural Resources and the Dollar Funds. On September 22, petitioner, Mrs. Vesco, other ICC officials and their wives returned to Newark aboard the 707 (Flight 60). On September 27, petitioner and other representatives of ICC were flown on the 707 from Newark to Bangor (Flight 63) where they participated in certain activities concerning opposing an attempted injunction against IOS. On October 10, petitioner was the only passenger aboard the 707 on a flight from Geneva to London (Flight 68) and on October 11 on the flight from London to Geneva (Flight 69). While in London, petitioner attended a board meeting of ILI-UK and also attended a meeting with Mr. Edward DuCann with respect to Mr. DuCann's taking an executive position with ILI-UK. On October 12, petitioner was the only passenger aboard Flight 70 from Geneva to Rome and the only person aboard Flight 71 returning the same day from Rome to Geneva. While in Rome, petitioner, along with *173 Mr. Meissner, met with Mr. Capone to discuss the sale of a 49 percent interest in an IOS affiliate. On Flight 73, on October 14 from Newark to Nassau, petitioner and Mr. Dodd were the only passengers. While in Nassau, petitioner met with representatives of IBL. Petitioner, along with other officers of ICC, was on Flight 75 from Newark to Nassau on October 21. In Nassau, petitioner and other passengers on the flight attended an IOS board meeting and a board meeting of an IOS affiliate. They also had conferences with respect to the spin-off of IBL. Flights 79, 80 and 81, all on October 28, were from Geneva to London with stopovers in Paris and Luxemburg. Petitioner, along with other officials of ICC and IOS, was aboard these flights. In Paris, petitioner met with a representative of Bank Rothschild with respect to the Rothschild Expansion Fund. In Luxemburg he met with members of the Banking Commission with respect to ODB-LUX, and in London met with representatives of Commonwealth United Corporation with respect to the proposed settlement of claims with subsidiaries of IOS and also met with Mr. DuCann with respect to ILI-UK. Flights 83, 84 and 85, all on November 3, from Newark *174 to Jacksonville, Florida and return to Newark from Jacksonville with a stopover in Washington, D.C., had petitioner and other representatives of ICC aboard. In Jacksonville a meeting which petitioner attended was held with a Mr. Edward Ball and Mr. Ray Mason with respect to the possible acquisition by the DuPont Estate and Charter Co. of a portion of ICC's interest in IOS. The stop in Washington, D.C. was as an accommodation to Mr. Ball. On November 9, petitioner and Mrs. Vesco flew on the Boeing 707 from Geneva to Beirut (Flight 88). They flew on the Boeing 707 from Beirut to Damascus, Damascus to Bombay, Bombay to Bangkok, Bangkok to Singapore and Singapore to Hong Kong (Flights 89 thru 93). They went by another form of transportation from Hong Kong to Osaka, Japan. Petitioner and Mrs. Vesco flew on the 707 from Osaka to San Francisco, San Francisco to Monterey, Monterey to Las Vegas and Las Vegas to Newark (Flights 95, 96, 97 and 98). On the portion of the flight from Geneva to Beirut, Mr. Hanspeter Brunner, Mr. Gilbert Straub and Ms. Barbara Rossner were also on the plane. From Beirut to Damascus, Damascus to Bombay and Bombay to Bangkok, in addition to petitioner and Mrs. *175 Vesco, Mr. Brunner was on the plane.At some of the places where the plane stopped, meetings were held with representatives of affiliates of IOS. Flight 99, on November 23, was from Newark to Dallas in order to take the plane into Dallas in connection with a program of refurbishing the plane. In late 1971 a contract to refurbish the plane was entered into for a cost of around $350,000. The plane was to have two bedrooms and a sauna. It was to be redecorated and the interior, including the galley and the seats, were to be redone. The negotiation with respect to this refurbishing was done by Mr. Dodd, who also handled the details of the operation of the plane. However, the only portion of the refurbishing actually done while the plane was in Dallas in the latter part of November and the early part of December 1971 was improvements to the galley and other interior work at a cost of $150,000. The remainder of the work called for under the contract was done after the end of 1971. On December 23 the plane flew from Dallas to Jacksonville with its only passenger Mr. Jack Pruitt. Petitioner boarded the plane in Jacksonville and was on board on Flight 101 on December 23 when the plane *176 returned to Newark. It was the custom of the Vesco family to take a summer vacation and a Christmas vacation. On December 26, 1971, petitioner, Mrs. Vesco, their children and Charley Fabel, Jim Gilbert and Joe Sozio, friends of their children, and Ms. Bailey flew on the plane from Newark to Gander and Gander to Beirut (Flights 102 and 103). On December 28, 1971, the plane flew with the same passengers to Cairo (Flight 104) and then from Cairo into Nairobi (Flight 105). The Vesco family and Ms. Bailey took an African Safari vacation from Nairobi. Prior to the departure of petitioner and Mrs. Vesco on Flight 86 on November 7, 1971, reservations and appointments had been made for petitioner and Mrs. Vesco in Beirut, Bankok, Singapore, Hong Kong and Tokyo. Their reservations in hotels in Beirut, Bankok, Singapore, Hong Kong and Tokyo were in the best suites available. In the notes kept by Ms. Bailey of the trip under appointments on November 9 and 10 were shown "Dinner in Beirut;" on November 11, "Dinner in Bangkok; on November 12, "Business meeting during day in Bangkok" and also on November 12, "Dinner in Bangkok--Ladies Invited;" on November 13, "Business meeting during day *177 in Bangkok; on November 16 or 17, "Dinner with Sir Kenneth Ping--Not confirmed yet per S. Hiller." Petitioner approved claimed reimbursements for expenses for travel and payments of entertainment expenses for Mr. Dodd and other officers of ICC. He also approved his own claims for travel advances and reimbursements for expenses. He sent statements and invoices for various charges and expenses into the accounting office of ICC for payment. Petitioner's notation on a statement or invoice that it was to be paid by ICC was not questioned and all statements or invoices which he sent to the accounting department of ICC for payment were paid by ICC. At times petitioner requested that an ICC check be made out directly to him as a travel advance. This was done at his request without question and petitioner, upon his return from a trip, was not required by ICC to account for expenditure of the funds advanced and did not account for his expenditure of these funds. Petitioner and other officers of ICC would quite often have lunch or dinner at a restaurant near the ICC offices in Fairfield by the name of Chez Leon. Generally, when petitioner was in the group having lunch or dinner at *178 Chez Leon, he would sign the ticket for the whole group and then okay the ticket for payment directly to Chez Leon by ICC. Sometimes attorneys or accountants outside of New Jersey would be at the Fairfield, New Jersey offices of ICC on business and petitioner would take them to Chez Leon for lunch and sign the check. Occasionally, when petitioner and other ICC officials had lunch or dinner at Chez Leon, Mr. Dodd would sign the check for the meals. Sometimes the ICC board of directors would meet at Chez Leon and generally petitioner would sign the check for the entire group. Stockholders meetings of ICC were held once a year in New York. After these meetings petitioner, other officers of ICC and some of the ICC stockholders would have lunch at the hotel where the meeting was held. Usually petitioner would sign a check at the hotel for the meals and have the hotel paid directly by ICC. Petitioner at times signed checks for meals at New York hotels following directors meetings, although generally these meetings were held in New Jersey and, if they were followed by a meal, the restaurant used would be Chez Leon. During the year 1971, petitioner belonged to the Downtown Athletic *179 Club, the Mountain Lake Country Club and the Rockaway River Country Club. Petitioner's dues and other expenses at these three clubs were paid directly by checks of ICC. Petitioner and his family used the two country clubs for personal entertaining and for other personal purposes. Petitioner made charges to his American Express card and the bills were paid directly by ICC. ICC did not own a limousine or helicopter but had an arrangement for limousine and helicopter rental. Petitioner used these services, and these services were used by his family at times for personal reasons. Prior to June of 1971, petitioner often took commercial flights to Europe. The following schedule shows in summary form the total amount of certain items paid by ICC at petitioner's direction: Chez Leon
$ 3,273.34
Rockaway River
Country Club
1,754.57
Downtown Athletic
Club
506.25
Mountain Lake
Country Club
355.17
Helicopter and
Limousine Service
2,537.00
American Express
6,820.98
Travel Tickets
3,888.17
Total
$19,135.48
Petitioner did not personally own an automobile, although Mrs. Vesco did. In 1971, she acquired a new Cadillac. Generous donations were made in *180 petitioner's name to the schools which his children attended. In 1971, one of the Vesco children was in Lehigh University and another in a private school. During 1971 petitioner signed expense vouchers for hotel and related expenses of $4,998.85, for airline tickets of $2,011 and for travel desk expenses of $4,815, which amounts were charged to ICC. The following schedule shows advances made to petitioner by ICC during 1971 and payments made which were shown on the books of ICC as being on petitioner's behalf or at his direction: Date of Check
Notation
September 2
Advance
$ 10,000.00
October 20
Advance
5,000.00
November 4
Advance
20,000.00
November 8
Advance
3,000.00
December 23
Advance
20,000.00
December 15
Advance
10,000.00
November 4
Eisenhauer--Expense
of round-the-world
trip
17,000.00
December 3
Cashier's check for
Sears
10,000.00
December 6
American National
Bank cashier's
check donation
10,000.00
December 6
Cashier's check
donation
5,000.00
October 13
World Wildlife
donation
500.00
October 13
World Wildlife
membership for Vesco
10,000.00
November 11
Vey Cadillac
7,403.25
April 15
Boca Raton Hotel and
Club
3,196.94
Total
$131,100.19
*181 In addition to the items set forth above, there were also payments made by ICC on invoices approved by petitioner to hotels, including the Carlyle, the Regency and the Waldorf in New York, New York. Payments were also made by ICC at petitioner's request to ticket agencies (apparently for theater tickets), car rental companies, a plane rental company, small payments to Vey Cadillac Company, payments to a Playboy Club and to airline clubs and payments for other miscellaneous items. ICC also paid a bill of petitioner's for taxes to the Township of Boonton where petitioner's home in New Jersey was located and an amount to a contractor working on petitioner's home. A payment of $559.43 on August 23, 1971, to Hertz for car rental was for a car rental made by petitioner, one made by Mr. Clay and one made by Mr. Eisenhauer. The total of all the payments in 1971 for advances to petitioner and for bills to petitioner which were sent by him to ICC for payment, plus other items shown on ICC records as payments on petitioner's behalf, was $170,621.06. All of the cash travel advances made to petitioner were reimbursed to ICC by IOS and some of the payments made on bills or statements sent *182 by petitioner to ICC for payment, such as American Express charges and hotel charges, were reimbursed to ICC by IOS. Most of petitioner's hotel bills away from Newark or New York were charged directly to IOS. The $170,621.06 comprised all the travel and entertainment expenses paid by ICC for petitioner in 1971 as shown on the records of ICC. Petitioner and Mrs. Vesco maintained a joint checking account at the American National Bank and Trust Company during the year 1971. Mrs. Vesco had another account and never actually used this joint account. Petitioner's secretary, Ms. Bailey, kept the records on this account and was authorized to draw checks on it. Among others, the following deposits were made in this account on the dates indicated: Date
Amount
February 17, 1971
$25,000.00
April 30, 1971
1,004.73
July 30, 1971
40.00
August 12, 1971
105.00
August 18, 1971
400.00
September 7, 1971
196.22
December 8, 1971
135.00
December 8, 1971
284.63
December 8, 1971
200.00
December 8, 1971
200.00
December 27, 1971
545.00
The February 17, 1971, deposit of $25,000 consisted of two checks from Bank Cantrade, a Swiss bank, in the amounts of $20,000 *183 and $5,000. Bank Cantrade, in Switzerland, was a bank in which petitioner kept a bank account during the year 1971. At times petitioner would use his account at Bank Cantrade in Switzerland to transfer to himself funds from an entity, Executive Financial, A.G., in which he had an interest. The $1,004.73 deposit on April 30, 1971, came from a check received from Mr. Clay in repayment of a loan petitioner made to Mr. Clay and so did the check for $545 deposited on December 27, 1971. The July 30, 1971, August 12, 1971, and December 8, 1971, deposits of $40, $105 and $135, respectively, were from moneys received by petitioner from an individual in payment for use of horse stalls on petitioner's property in New Jersey. The August 18, 1971, deposit of $400 was an amount received from an individual by the name of Marty Solomon. The two $200 deposits on December 8, 1971, were from funds received by petitioner from Powdermilk Lodge, a bar in Mt. Freedom, New Jersey, in which he had an interest. Executive Financial, A.G. was a holding company headquartered in Switzerland which held the stock of two companies, Executive Services and Executive Growth Funds, engaged in the businesses of *184 managing and operating a mutual fund. Executive Financial also had an investment in a bank, Standard Commerz Bank, Lucerne. About 20 persons were employed in the operation of the Executive Financial group. One of the investors in Executive Financial, A.G. and its subsidiaries was Carl W. Anderson. During the year 1969 and continuing through a final amount paid on January 8, 1970, Mr. Anderson made an equity investment of $10,000 in these entities and lent the entities $135,000. He attended certain meetings in connection with the organization of Executive Financial, A.G. and during the course of these meetings got the impression that petitioner was to invest twice as much in Executive Financial as he invested. Mr. Anderson, on his 1971 Federal income tax return, claimed a deduction of the entire $145,000 of investment in and loans made to Executive Financial as a loss. Mr. Ulrich Strickler was employed as the manager of Executive Services and in this capacity was responsible for the hiring and firing of employees, seeing that the books were kept and the general management of the offices. Mr. Gilbert Straub was responsible for the sales of the mutual funds to clients and Mr. *185 Eugene Chamedes for the investment of the receipts of such sales.
Petitioner made investments in and loans to Executive Financial from time to time. The following schedule shows checks drawn on petitioner's bank account to Executive Services: Amount of Date
Payee of Check
Check
October 3, 1969
The Executive
$29,400
Services, A.G.
(illegible) 1969
The Executive
32,000
Services, A.G.
The following schedule shows the dates of certain transfers of funds from petitioner's account with the amount and the description of the transfer: Date
Description
Amount
July 31, 1969
To Bank Leu, A.G., Zurich,
Switzerland thru
$20,000.00
Morgan Guaranty Trust Co.
Aug. 21, 1969
To Bank Leu, Ltd., Zurich,
Switzerland for
25,000.00
a/c The Exec. Management A.G. 8022 Zurich,
Switzerland order Telex Transfer--Mrs. Shirley
Bailey to Miss N. Kopp.
Aug. 26, 1969
To Bank Leu, Ltd., Zurich,
Switzerland for a/c
55,000.00
8022 Zurich, Switzerland order Telex Transfer.
Nov. 25, 1969
To Bank Leu, Ltd., Zurich,
Switzerland thru
9,000.00
Morgan Guaranty Trust Co.
Dec. 3, 1969
To Bank Leu, Ltd., a/c Executive
Services, Inc.,
19,000.00
Zurich, Switzerland
Feb. 24, 1970
Telex Transfer of funds to Bank Cantrade,
Zurich,
90,000.00
Switzerland
Mar. 24, 1970
To Bank Leu, Zurich, Switzerland for a/c
10,000.00
Executive Services, Inc. through Morgan Guaranty
Trust Co.
June 4, 1970
To Bank Leu, Zurich,
Switzerland for a/c
10,000.00
Executive Services
June 23, 1970
To Standard Commerz Bank,
Lucerne, Switzerland
32,500.00
for a/c Executive Services,
A.G., in Zurich
June 29, 1970
To Standard Commerz Bank, Lucerne,
90,022.40
Switzerland $90,000.00
Charges 22.40
*186 On April 25, 1969, petitioner transferred $100,000 to a trust account of Howard Cerny, an attorney, with the understanding that it would be transferred to Executive Financial in Switzerland on behalf of petitioner. Mr. Cerny did make the transfer. In early June 1970, all the assets, including the fixtures and other physical assets of the mutual funds subsidiaries except for the stock investment in Standard Commerz Bank, were sold. In late 1970, the investment in the bank was sold at a profit. After this sale, none of the three entities had any remaining assets. Mr. Anderson received no payment with respect to either his investment in Executive Financial or his loans to that company upon the sale of the assets of the companies. After payment of certain expenses, such as salaries, the total funds received from the sale of assets of the Executive Financial group in early June were transferred to petitioner in 1970 and the total amount received from the sale of the stock investment in Standard Commerz Bank was paid to petitioner in 1970. Although at the end of 1970 neither Executive Financial nor its subsidiaries had assets, petitioner still had title to his stock in Executive *187 Financial. In early 1973 two agents of respondent came to the offices of ICC to investigate the records of ICC with respect to payments to or on behalf of petitioner and other officers of ICC. In the course of this audit the agents made a list of all items of advances by ICC to petitioner and of amounts paid by ICC to restaurants, hotels, auto rental companies, credit card companies and various other payees that in their view constituted payments by ICC of personal charges of petitioner. The agents obtained information from the records of ICC and obtained information with respect to the payments from Mr. Laurence B. Richardson, Jr., the then president of ICC. Mr. Richardson became associated with ICC in late 1970, shortly after ICC acquired an 80 percent interest in All American Engineering Company of which he was president and chief executive officer. Throughout 1971 he was an officer and director of ICC. In 1971, he became president of ICC even though petitioner was still chairman of the board and chief executive officer of ICC. In September 1972, petitioner resigned as chairman of the board and chief executive officer of ICC and at that time Mr. Richardson became acting *188 chief executive officer and chairman of the board of ICC. As soon as he became the acting chief executive officer of ICC, Mr. Richardson had a report prepared for him by the acting chief financial officer of ICC, Mr. Benjamin. The report contained a number of items that Mr. Richardson considered questionable that involved payments by ICC made on approval by petitioner when he was chief executive officer.Part of Mr. Richardson's problem was with payments with respect to the Boeing 707 airplane. He was not concerned with payments in 1971 because ICC had received reimbursement in that year for most of the costs of the Boeing 707 from IOS. He did find a number of other items in 1971 and many items in 1972 that had been paid on behalf of officers of ICC, including petitioner, that were not in his opinion properly explained and payments of some items that he considered to be personal items of the officers for whom the payment was made rather than a proper expense of ICC. At approximately this time petitioner had his secretary, Ms. Bailey, make up a list explaining some of the questioned items. In early 1973, after this list was compiled, petitioner made some reimbursement to ICC for *189 some personal items paid on his behalf by ICC. On November 27, 1972, the Securities and Exechange Commission (SEC) filed a civil action in the United States District Court for the Southern District of New York against petitioner and others alleging use of the mails to defraud purchasers of securities. In June 1973, ICC filed a civil suit for damages against petitioner and others in the United States District Court for the Southern District of New York. In February 1973, Mr. Richardson filed an affidavit with the United States District Court for the Southern District of New York with respect to items which he considered had been improperly paid by ICC on behalf of petitioner. At various times during the period September 1972 to December 1972, Mr. Richardson asked petitioner either to repay withdrawals he had made from ICC or satisfactorily explain them with an expense report and a written statement. In Mr. Richardson's view no satisfactory explanation was made. In 1971 and 1972, Mr. Richardson had some conversations with Ms. Bailey with respect to petitioner making out expense reports to account for uses of advances made to him by ICC. However, petitioner, while he was the *190 chief executive officer of ICC, refused to make such reports. At that time, in addition to being chief executive officer of ICC, petitioner owned approximately 22 percent of the ICC stock. Also at that time, Fairfield General Corporation that owned Skyways Leasing, the owner of the Boeing 707, was owned 100 percent by ICC and consideration was being given in the middle of 1971 to having that stock distributed out to the shareholders of ICC as a stock dividend. This was done some time in 1972. Respondent's agents' conversation with Mr. Richardson with respect to payment of items by ICC for petitioner was at approximately the time that Mr. Richardson was preparing his affidavit to be filed in the United States District Court for the Southern District of New York or shortly after it had been prepared. The two agents who were working on compiling the lists of amounts paid by ICC for petitioner began an audit of ICC and another agent was assigned to the investigation of the 1971 joint income tax return of petitioner and Mrs. Vesco. This agent consulted with the agents who had been working on investigating petitioner's tax liability and who were working on the ICC audit for 1971. *191 On the basis of information obtained from the other agents, the agent who prepared the report as to petitioner's 1971 tax liability made the adjustments in his report with respect to the charging of the cost of operation of the Boeing 707 to petitioner and the additions to petitioner's income for personal items of petitioner paid by ICC.The notice of deficiency was based on this agent's report.
In February 1973, petitioner permanently departed from this country and has not since returned. The agent investigating petitioner's tax liability met with representatives of petitioner and requested certain information from them. Before any such information was furnished the discussions were discontinued by petitioner's representatives. On June 1, 1973, a criminal indictment was returned against petitioner charging him with violation of 18 U.S.C. secs. 1503, 1505 and 1510 (1948). Thereafter several other indictments were returned against petitioner charging him with various Federal offenses. Warrants were issued for petitioner's arrest. The criminal docket sheet with respect to one of these indictments bears the following notation: 12/11/74 Closed statistically *192 because * * * defendant is a fugitive. In all other respects this case is still pending. In his notice of deficiency issued to petitioner on October 2, 1973, with respect to the calendar year 1971, respondent increased petitioner's income by $1,001,350.73 with the explanation that during the year 1971 ICC made certain payments "to you or for your benefit and permitted you to use corporate property without compensation." The items composing the $1,001,350.73 consisted of the $830,729.69, which was the total cost of the operation of the Boeing 707 as shown on the books of ICC, plus the $170,621.06 of items which respondent determined were payments by ICC for the personal benefit of petitioner. Respondent further increased petitioner's income as reported by $63,757.14 with the explanation that these amounts represented unexplained bank deposits to petitioner's bank accounts at the American National Bank and Trust Company, Morristown, Pennsylvania. [3]
Petitioner, on his Federal tax return for the year 1971, showed a long-term capital *193 gain of $233,688.63 which he offset by a capital loss of $187,626 from Executive Financial, A.G. and a capital loss carryover of $47,970 from 1970. [4]
Respondent in his notice of deficiency disallowed petitioner's claimed capital loss from Executive Financial, A.G. and the claimed capital loss carryover from 1970. OPINION Petitioner's first contention is that the determination set forth in respondent's notice of deficiency is arbitrary and capricious and therefore "the burden of proof" in this case is on respondent. Respondent's first contention is that because petitioner is a "fugitive from justice" this Court should exercise its discretion not to consider the evidence with respect to the issues introduced in this case but should determine the full deficiency against petitioner. Respondent, in the alternative, argues that before this Court makes its determination in this case petitioner should be required to put up a bond to cover the deficiency *194 in this case as well as the deficiencies in several other cases pending before this Court involving petitioner's income tax liabilities for the years 1969, 1970 and 1972 and gift tax liabilities for 1971 and 1972. Petitioner has totally failed to show that respondent's determination in this case as set forth in the notice of deficiency was arbitrary and capricious. The evidence in fact shows that respondent's determination is based primarily on data and information obtained by his agents from records of petitioner's employer, ICC. The record shows that petitioner was out of the country at the time his tax liability for 1971 was being investigated and that conferences between respondent's agents and petitioner's representatives with respect to the audit were broken off by petitioner's representatives. [5]
*195 Respondent's agents did a thorough and comprehensive investigation of the records of payments by ICC to petitioner or on his behalf. They had discussions with representatives of ICC and looked at the documents underlying the entries on the books of ICC. At the time of the investigation petitioner was out of the country and no records of petitioner were supplied to the agents by his representatives. [6] The issues in this case involve the correctness of the amount of petitioner's tax liability for 1971 as determined in the notice of deficiency and whether petitioner is liable for an addition to tax for negligence or intentional disregard of rules and regulations as determined in that notice.There is no issue in the case with respect to which the burden of proof is on respondent either by statute or under the rules of this Court. See Rule 142, Rules of Practice and Procedure, United States Tax Court. [7] In our view respondent's determination in this case is not arbitrary or capricious and the burden is on petitioner to show error in respondent's determination. Durovic v. Commissioner,54 T.C. 1364, 1390 (1970), affd. in part, revd. in part on other grounds 487 F.2d 36 (7th Cir. 1973). *196 *197 In our view, as hereinafter discussed, petitioner has proved that much of the use of the 707 airplane was for business purposes and therefore the value of such use is not properly includable as an income item to petitioner, and that not all of the $170,621.06 of travel and entertainment expenses of petitioner paid by ICC were properly chargeable as income to petitioner. However, the fact that after a lengthy trial a taxpayer may be able to show that in some respects respondent's determination is in error in no way establishes that respondent's determination is arbitrary and capricious. See Ruidoso Racing Association, Inc. v. Commissioner,476 F.2d 502, 507-508 (10th Cir. 1973), affg. in part and remanding a Memorandum Opinion of this Court. Mason v. Commissioner,64 T.C. 651, 659 (1975). Respondent contends that we should determine the deficiency on the basis of his notice to petitioner because petitioner is a "fugitive from justice," citing Molinaro v. New Jersey,396 U.S. 365 (1970), and cases following the holding in that case. The Molinaro case involved a petition for certiorari to the Supreme Court by a person who after *198 having been convicted of a crime became a fugitive from justice. The Supreme Court in that case stated that it had discretion under those circumstances to dismiss the appeal (at 366): No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction.* * * Respondent argues that this ruling has been extended to civil litigation in Broadway v. City of Montgomery, Alabama,530 F.2d 657 (5th Cir. 1976). Respondent recognizes that the burden is on him to establish that petitioner is a fugitive from justice, United States v. Mellon Bank, N.A.,521 F.2d 708-709, fn. 4 (3d Cir. 1975), but argues that he has discharged this burden by showing various indictments returned against petitioner and the statement on the docket entries with respect to one of these indictments. Respondent also recognizes, and the cases cited by him clearly indicate, that whether a court will refuse to hear a case on its merits where it has been established that the person appealing the case is a "fugitive from justice" *199 is discretionary. Every case cited by respondent except Dawkins v. Mitchell,437 F.2d 646 (D.C. Cir. 1970), deals with an individual who had been convicted either upon a plea of guilty or after a trial of an offense and later had become a fugitive either by leaving the country while free on bond or after an escape from prison. Dawkins v. Mitchell,supra, affirmed a dismissal for lack of jurisdiction by the District Court of an action to enjoin enforcement of a warrant issued under the "Fugitive Felon Act." Respondent recognizes here that we have jurisdiction in this case, which clearly we do, under the provisions of section 6213. See also United States v. Stanzione,391 F. Supp. 1201 (S.D.N.Y. 1975). The facts in this case show that petitioner left this country before any indictments were returned against him. The records introduced by respondent show that because the marshall was unable to arrest petitioner and because no appearance was made by petitioner, a plea of not guilty was entered by the court on his behalf on the record. The only further actions shown by docket records of the clerk in connection with these cases *200 are some proceedings with respect to attempted extradition and finally that one case was marked technically closed, giving as the reason "fugitive." We need not, however, decide whether we would be justified under the facts shown here in determining that under the holding in Molinaro v. New Jersey,supra, petitioner is a "fugitive from justice" or whether, under the limited jurisdiction conferred on us by statute, we would be justified in determining the deficiency as set forth in respondent's notice if petitioner were considered a "fugitive from justice." If petitioner is considered a "fugitive from justice" and we do have discretion for this reason to determine the deficiencies as set forth in the notice, even though the evidence in the case shows the amount determined to be excessive, we would not here exercise our discretion to so hold. In this case the deficiencies were determined against both petitioner and Mrs. Vesco. The record shows that each of them filed a petition with this Court. Mrs. Vesco (Patricia Vesco v. Commissioner, Docket No. 8873-73) contends in her case that she is "an innocent spouse" under section 6013(3). The parties agreed *201 that Mrs. Vesco would accept the determination with respect to the merits of the adjustments made by respondent in this case in her case. Mrs. Vesco appeared at the trial of her case and testified. Under the agreement of counsel, any determination we make in the instant case will be binding on Mrs. Vesco in her case. Respondent in no way contends that Mrs. Vesco is a "fugitive from justice" nor does the record show any commencement of any type of criminal action against Mrs. Vesco. In the case of Broadway v. City of Montgomery,Alabama,supra, so strongly relied on by respondent as being the case to extend the rule in Molinarov. New Jersey,supra, to a civil proceeding, the court determined the merits of the civil action brought by all appellants except the one who the court considered to be a fugitive from justice. We would not exercise our discretion after having found on the basis of the evidence in this record the proper amount of the income tax liability of petitioner for the year 1971, which we must do to determine Mrs. Vesco's case, [8] to hold petitioner liable for more than that amount of tax because of criminal indictments *202 returned against him after he left this country. On this record we consider respondent's argument that we should determine that petitioner owes the amount of tax as set forth in the notice of deficiency without considering the voluminous evidence introduced at the trial of this case to be without merit. After decision is entered in this case, it might be that respondent could obtain an order from a United States District Court requiring petitioner, if it could obtain jurisdiction over him, to repatriate funds sufficient to pay the amount determined to be due if such repatriation were not in violation of the laws of another country. See United States v. McNulty,446 F. Supp. 90 (N.D.Cal. 1978), and United States v. Ross,302 F.2d 831 (2nd Cir. 1962). Respondent has cited no authority in support of his argument that we would have jurisdiction to require a bond from petitioner for the full deficiency determined by him as a prerequisite to deciding this case, and we have found no such authority. The respondent first raised the contention with respect to a bond on brief after a lengthy trial of this case. Under these circumstances we would not enter *203 the order he seeks and further delay this case if we did have discretion to do so. An action in the United States District Court for determination of ownership of property distrained on by respondent after a jeopardy assessment of petitioner's 1971 tax liability and foreclosure of lien by the Government has been stayed until our disposition of this case. This stay was by an order of the United States District for New Jersey on a motion for reconsideration. However, for a discussion of the background of the issuance of the stay order see Bailey v. United States,415 F. Supp. 1305 (D.C. N.J. 1976). *204 The first issue involving the merits of the deficiency determined is the amount, if any, of income petitioner received from personal use of the 707 airplane leased by ICC from one of its subsidiaries. Respondent continues to argue that the record supports a holding that the airplane was acquired principally for petitioner's personal use and was used primarily for personal purposes of petitioner.For this reason respondent argues that the cost of operation of the plane should be considered to be a payment by ICC for petitioner's personal benefit and therefore income to petitioner. Respondent has conceded that certain flights of the plane were for business purposes of ICC but does not on this basis change his contention that the entire cost of operation of the plane should be considered as income to petitioner.
In our view the evidence establishes that the majority of the flights by the 707 were made for business purposes of ICC or IOS even though Mrs. Vesco was on many of these flights for no business purpose. However, there are some of the flights which the evidence indicates were primarily for the personal purposes of petitioner. The evidence shows that the flights beginning *205 December 26, 1971, from Newark to Gander, Gander to Beirut, Beirut to Cairo and Cairo to Nairobi (Flights 102, 103, 104 105) were directly tied in with a long planned Christmas vacation for petitioner and his family on an African Safari. Petitioner does not claim that any passenger on the flights, except petitioner himself, had any business reason for the trip. There is little testimony in the record to show what, if any, activities of a business nature petitioner engaged in while in Beirut and Nairobi. Apparently the Gander stop was merely for refueling and the Cairo stop is not explained in the record. The record shows that IOS had operations in Beirut and Nairobi. There is also some testimony in the record about difficulties in the Nairobi operations because of blocked funds even though the operation was profitable. There is no direct evidence whatsoever of what petitioner did in Beirut and Nairobi. The evidence in the record indicates that any business petitioner may have conducted on this trip was an afterthought in the planning of a pleasure trip. [9] Ms. Bailey testified vaguely about believing that petitioner called on some persons connected with IOS because of some appointments *206 she had set up, but she had no firsthand knowledge of any business transacted by petitioner during the trip nor did she observe petitioner carrying on any business activities. Ms. Bailey, however, referred to the trip as the family's Christmas vacation. The other witnesses testifying in regard to this trip had no firsthand knowledge whatsoever of petitioner's activities on the trip. Their testimony was based on some knowledge of IOS activities in these areas and reports they heard of business meetings by petitioner. *207 Certainly the mere fact that petitioner may have had some short conversations with representatives of IOS in Beirut and Nairobi while on a long planned vacation with his family and friends of his children does not convert a vacation trip into a business trip. From the evidence we conclude that Flights 102, 103, 104 and 105 were a use by petitioner of property of ICC for his personal benefit and the value of this use of the property is income to him. Estate of Runnels v. Commissioner,54 T.C. 762, 767 (1970). International Artists, Ltd. v. Commissioner,55 T.C. 94 (1970); Ashby v. Commissioner,50 T.C. 409, 417-418 (1968); Silverman v. Commissioner,28 T.C. 1061, 1068 (1957), affd. 253 F.2d 849 (8th Cir. 1958). Flights 88 through 98 constituted an "around-the-world trip." Petitioner and Mrs. Vesco were the only passengers on the plane after the flight from Bombay to Bangkok. From Beirut to Bangkok (Flights 89, 90 and 91) the only passenger besides getitioner and Mrs. Vesco was "Dr. Hanspeter Brunner." There is testimony with respect to Dr. Brunner's connection with IOS, but Dr. Brunner did not testify *208 at the trial of this case. Neither Mr. Gilbert Straub nor Ms. Barbara Rossner, the two other passengers from Geneva to Beirut testified at the trial. There is no direct evidence of petitioner's activities in Beirut, Damascus or Bombay, although there is testimony in some detail of the type of operation IOS had in Beirut. The record contains no direct evidence and little indirect evidence of petitioner's activities in Bangkok, Singapore, Hong Kong, Osaka, San Francisco and Las Vegas. In our view, the only portion of this round-the-world trip which has been shown to have any substantial business connection is Flight 88 from Geneva to Beirut. The balance of this trip appears from the record to be primarily a personal round-the-world trip of petitioner and Mrs. Vesco. [10] The major portion of this round-the-world flight appears from the record to be primarily for personal reasons and therefore the value of the use of the 707 for this personal trip is properly includable in petitioner's income. *209 The only other flights where there is a substantial question as to whether the flights were for primarily business reasons or primarily personal reasons are Flights 5, 6, 15, 16, 31 and 32. There is testimony in the record of business activities of petitioner in Amsterdam by a person who met him there and accompanied him on business assignments. The fact that petitioner took his entire family along on a pleasure trip while he transacted business does not of itself require the conclusion that the trip was primarily personal. The record indicates that petitioner's children were in Geneva for the summer and the weight of the evidence is that he took Mrs. Vesco and his children along with him on a business trip for their pleasure. The flight from Toronto to Rome and then Rome to Geneva raises some question. There is evidence of a business reason for a flight from Toronto to Geneva but less evidence of a business reason for the flight stopping in Rome. The fact that the Vesco children had come back to Rome after a vacation in Greece with Ms. Bailey and were picked up by the 707 and taken to Geneva is a strong indication that the diversion of this flight on its way from Toronto to *210 Geneva to Rome was for the purpose of returning the Vesco children to Geneva. This is even further indicated by the fact that Messrs. Meissner, Slater and Fox were on the flight to Rome but did not go on to Geneva. However, there is indication of the need for the three passengers, besides petitioner and Mrs. Vesco, to be in Rome on business. Weighing all the evidence we have concluded that the stopover in Rome was primarily for business purposes even though petitioner, Mrs. Vesco and the Vesco children were the only ones who continued on this flight to Geneva. We do not form the same conclusion with respect to Flight 31 from Geneva to London. The record shows that on July 24 the 707 flew from Geneva to London with petitioner and Mr. Clay aboard and that afternoon returned to Geneva with only petitioner aboard. The next day the 707 flew back to London with petitioner, Mrs. Vesco, the Vesco children and certain of their friends aboard. This record shows no passengers on that trip even claiming to be going to London for business purposes other than petitioner. We fail to see why it would have been necessary for the 707 to return to Geneva on the 24th of July when Mr. Clay remained *211 in London and only petitioner returned to Geneva and fly back to London on the 25th of July for any business purpose. We therefore conclude that this flight was primarily for personal purposes of petitioner to pick up Mrs. Vesco and the Vesco children to take them to London for a vacation. Ms. Bailey testified that she was aboard on this flight to spend a vacation in London, which she did, sightseeing and shopping with Mrs. Vesco and the Vesco children. The flight on July 28, 1971, from London to Newark likewise had no passengers who claimed any business reasons other than petitioner and Ms. Bailey who stated she was returning from work in Geneva as well as from a vacation to her work in New Jersey. On August 1, the 707 flew back from Newark to Geneva with petitioner and Mrs. Vesco aboard. Flight 32 on July 28 from London to Newark appears to have been primarily to bring the Vesco children and Ms. Bailey home from a European vacation. We therefore conclude that the primary reason for this flight was the personal convenience of petitioner and that the value of his use of the 707 for this personal purpose is income to him. Without going into detail as to the other flights, we conclude *212 that they were primarily for business purposes, including having necessary checks made on the plane and therefore the value of these flights are not includable in petitioner's income. The more difficult problem is to determine the amount to be charged as income to petitioner from these flights. There is testimony in the record by Mr. Norman LeBlanc to the effect that it cost approximately $2,000 an hour to operate the 707 and that a flight "across the Atlantic" took about four hours. We realize that this is merely a rough estimate. However, Mr. LeBlanc had been involved in negotiations on behalf of IOS with respect to the proper amount of charges to be made to IOS by ICC for flights of the 707.Also, using such rough estimates on flight time would have meant that a payment of $830,000 would have represented around 400 flight hours in 1971. [11] Mr. LeBlanc did not explain his estimate of four hours to fly across the Atlantic. The record of flights of the plane show that often stops were made in Gander, so he was presumably referring to across the Atlantic from Gander. If this assumption is made, a flight from Newark to London would apparently take from five to six hours and a *213 flight to Geneva a little longer. Using Mr. LeBlanc's estimate of four hours to cross the Atlantic, we have on the basis of recognized distances concluded that the plane was used primarily for personal reasons by petitioner for a total of 45 hours in 1971. On this basis we have determined that petitioner received a total of $90,000 of income as the value of his personal use of the 707 in 1971. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). [12]
*214 In our computation of the $90,000 we have added no amount to petitioner's income for transportation furnished to Mrs. Vesco and the Vesco children when they accompanied petitioner on a business trip he took for the benefit of either IOS or ICC. It is clear from the testimony as to the size of the plane and the accommodations offered on the plane that there would have been vacant seats on all the business trips on which Mrs. Vesco and the Vesco children accompanied petitioner if petitioner's family had not accompanied him. In our view the record supports the conclusion that Mrs. Vesco and at times the Vesco children occupied seats on these business flights that would have been vacant had they not accompanied petitioner on the flight. Certainly petitioner did receive a type of "fringe" benefit from having Mrs. Vesco and on some trips his children have free flights on the 707. Without discussing the various proposed regulations, committee reports and other items discussed by the parties in their briefs, we accept, as both parties ultimately conclude, that this type of "fringe" benefit has not generally been considered to be includable in the taxable income of a taxpayer. The parties *215 refer to the type of benefit that has not generally been considered income to an employee as being a personal passenger in a company-owned automobile driven on official business, free flights given to airline employees and free passes given to railroad employees and their families. See O.D. 946, 4 C.B. 110 (1921). Respondent makes a very logical argument that this type of use of an employer's property for the personal benefit of an employee, even though it costs the employer nothing, does constitute an economic benefit which, under the broad definition of income in section 61, could be considered income to the employee. However, as both parties recognize, it has never been the practice of respondent to consider "fringe" benefits, such as a free pass, to be income to the employee. In O.D. 946, supra, the free passes to railroad employees and their families were considered to be "gifts." In our view petitioner should not be treated differently from other taxpayers with respect to the inclusion of the value of such benefits in income. We do not here determine the validity of respondent's argument if his longstanding practice were changed as to all taxpayers. We *216 merely hold that respondent's practice in effect in 1971 should be applied to petitioner on the same basis as it is applied to other taxpayers.We therefore hold that $90,000 is the amount properly includable in petitioner's income for the fair rental value of his personal use of the 707 airplane. [13] See Zager v. Commissioner, 72 T.C.     (Sep. 5, 1979), at 10-12 of slip opinion. The next issue is whether all or any part of the $170,621.06 of advances made to petitioner by ICC and payments made by ICC of bills incurred by him constitute income to petitioner. *217 The record shows that most of petitioner's hotel bills for official travel were either charged to IOS or ICC. Although the record is not clear in this respect, it appears that most of petitioner's other travel expenses were included in the $170,621.06 shown on ICC's books as travel and entertainment expenses of petitioner. The record indicates that petitioner did not submit travel vouchers to justify these payments and did not submit information to justify other bills he sent to ICC for payment. Also, petitioner did not account for the various travel advances that he drew from ICC. Although ICC was reimbursed for most of these expenses by IOS, it is immaterial which of the two corporations ultimately paid the amounts for petitioner's benefit if the payments were in fact for personal expenses of petitioner. See American Properties, Inc. v. Commissioner,28 T.C. 1100, 1114-1115 (1957). We have set forth in our findings by category a total of over $150,000 of the charges comprising the $170,621.06. Of the items set forth, respondent now concedes that if the $500 donation and the $10,000 membership fee paid to World Wildlife were in fact paid on petitioner's behalf *218 and should be charged as income to him, petitioner would be entitled to a charitable deduction in an amount of $10,500 for this donation. We therefore need not be concerned with whether these payments were income to petitioner since if they were they would not increase his taxable income. The record shows that the $170,621.06 is the entire amount of travel and entertainment expenses paid on petitioner's behalf as shown by the records of ICC.The inference in the record is that other than hotel bills most of petitioner's travel expenses were paid by ICC even though ICC was reimbursed by IOS for many of these items. [14]
*219 Clearly, some of the items which were paid by ICC for petitioner are personal items and constitute income to petitioner. In this category are the amounts of $234.24 and $235.12 paid to the Township of Boonton on August 11, 1971 and October 26, 1971, respectively, as taxes on petitioner's house, and the amount of $556.60 paid on August 24, 1971, to a workman for work done on petitioner's personal residence. [15] The record does not show the reason for the payment on November 11, 1971, to Vey Cadillac of $7,403.25. Mrs. Vesco's personal automobile was apparently paid for to the extent of $5,413.50 by a check on petitioner's personal account. Because of lack of proof with respect to this payment, we determine that this amount is payment of a personal expense of petitioner. There was some testimony in this record that *220 petitioner used the Downtown Athletic Club, the Mountain Lake Country Club and the Rockaway River Country Club for some business purposes.However, after considering the lack of actual knowledge of the use of these clubs by the witnesses testifying in this regard, we do not consider this testimony to have any value.The record is clear that petitioner and his family used the country clubs at times for personal use.Most of the payments to the Downtown Athletic Club and the Mountain Lake Country Club appear to be for petitioner's monthly dues and some of the payments to the Rockaway River Country Club appear to be dues payments. We conclude that the entire $506.25 paid to the Downtown Athletic Club, the entire $355.17 paid to the Mountain Lake Country Club and the entire $1,754.57 paid to the Rockaway River Country Club by ICC were payments of personal items for petitioner and the amounts of these payments are properly includable in his income. While the record is not completely clear, it does indicate that prior to June of 1971 when a subsidiary of ICC acquired the 707 petitioner on a number of occasions traveled to various places in Europe on business for ICC or IOS by commercial *221 airline. All the payments to travel agents for airline tickets included in the $170,621.06 were made prior to June. In fact, the last such payment was made on March 2, 1971. Considering the record as a whole, we conclude that the entire $3,888.17 paid to travel agencies for airline tickets was proper business expense of petitioner and is not includable in his income. For the same reason we conclude that the amount of $2,011 for airline tickets and the amount of $4,815 for travel desk expenses charged to ICC on vouchers signed by petitioner are not includable in petitioner's income. The cashier's check for $10,000 and the cashier's check for $5,000 were marked "donations." There is some testimony in the record that petitioner made generous donations to charitable organizations. From the check register in evidence it appears that one of petitioner's children attended Lehigh University in 1971 and at least one of the others attended a private school. There is some indication in the record that the $10,000 donation went to Lehigh University and the $5,000 to a private school. While the evidence is not completely clear in this regard, we conclude that the $15,000 should be eliminated *222 from the income charged to petitioner for the same reason that respondent now concedes the $10,500 donation to the World Wildlife Fund should be eliminated. We have been unable to find any satisfactory explanation in this record for the $3,196.94 paid on April 15 to the Boca Raton Hotel and Club and for this reason conclude that this amount constitutes income to petitioner. The record shows that much of the use of limousine service and helicopter service were in connection with petitioner's business travel but that petitioner did at times, as did Mrs. Vesco and the Vesco children, use these facilities for personal reasons. There is little evidence as to how these payments should be allocated between business and personal use. Therefore, weighing heavily against petitioner for the lack of preciseness of the evidence, we conclude that one-half of each of these amounts constitutes income to petitioner. There is much testimony in the record with respect to the use of Chez Leon. Apparently a high percentage of this use was by petitioner and other officers of ICC as a place to have lunch or dinner when they were working at ICC or having a meeting in connection with ICC business. *223 On these occasions the only portion of the bill properly chargeable to petitioner is the cost of his own lunch or dinner. The other officials who ate with petitioner at Chez Leon would have received income represented by the cost of their lunch or dinner paid by ICC. The record does show that at times petitioner paid the bills at Chez Leon for lawyers or accountants who were at the ICC headquarters on ICC business. Our best judgment on the basis of this record is that one-third of the total payments of the bills at Chez Leon represent payments of personal items for petitioner which are includable in his income and the other two-thirds is not properly chargeable as income to petitioner. The evidence, though not unmistakably clear, does show a need by petitioner, particularly in the first half of 1971, for membership in the various airline clubs and we conclude that those payments by ICC were proper payments of business expenses of petitioner. Nothing has been shown as to the payments to the Playboy Club or to the ticket agencies, apparently for theater tickets, and we conclude that those items are properly considered to be income to petitioner. Also, the indication is that the *224 payments to Vey Cadillac, in addition to the one large payment, were for service to Mrs. Vesco's personal automobile and therefore we conclude that these amounts should be included in petitioner's income. There is considerable testimony in the record concerning use of the Carlyle, the Regency and the Waldorf hotels in New York for ICC stockholders meetings. However, the record is not clear as to why petitioner charged items at these hotels and what the charges were for. There is not sufficient showing in the record that the amounts paid to these hotels were connected with business activities of either ICC or IOS for us to conclude that these amounts were proper business expenses of petitioner. We therefore hold these payments were for personal expenses for petitioner and are includable in his income. There is evidence in the record that at least in one incident some of the charges for automobile rental included in the $170,621.06 were for automobiles used by other executives of ICC. There is no direct testimony as to the usage made of the automobiles. Again, weighing heavily against petitioner for lack of preciseness, we conclude that one-half of the amounts of automobile *225 rental charges paid for petitioner was a proper business expense and the other half was a personal expense of petitioner and is includable in his income. The hotel bills and related expenses of $4,998.85 charged to ICC on vouchers signed by petitioner include charges at hotels in London and other locations. The record shows that petitioner went to London and the other places where these hotels were located on business and also shows that at times he was accompanied on these trips by Mrs. Vesco and the Vesco children. From the record it appears that only part of these hotel bills charged to ICC were business expenses of ICC.Payment by ICC of Mrs. Vesco's hotel expenses and the hotel expenses of the Vesco children constitutes income to petitioner. Weighing heavily against petitioner for the lack of preciseness in the record as to the portions of the hotel expenses which were his expenses and the portions which were expenses of Mrs. Vesco and the Vesco children, we conclude that one-half of the $4,998.85 of hotel expenses charged to ICC on vouchers signed by petitioner constitute income to petitioner as a payment by ICC of expenses of Mrs. Vesco or the Vesco children. The other one-half *226 of this amount is not income to petitioner. Such items on the list as the charge to Le Club, noted "dues Vesco," and Ocean Club, noted "deposit for reservations Vesco," have not been shown to be proper business expenses and we therefore conclude that they constitute income to petitioner. The payment to a hotel in Bangkok appears to be in connection with trip we have held to be primarily personal. However, as will be discussed hereinafter, there is indication that petitioner did have some business appointments during this trip.Expenses on this trip actually paid by ICC for business purposes would not be income to petitioner even though the trip was primarily personal. See Duncan v. Commissioner,30 T.C. 386, 391 (1958). However, there is no showing that the payment of the bill to the hotel in Bangkok was not a personal expense. We therefore conclude that this payment was of a personal expense of petitioner and includable in his income. The evidence shows that the $10,000 check paid to an attorney, Mr. Sears, was for legal services in connection with an arrest of petitioner for activities connected with the conduct of his business for IOS. While the amount *227 may not properly have been an expense of ICC or IOS, certainly if it is considered income to petitioner as a payment for his benefit it is clearly a deductible item. Commissioner v. Tellier,383 U.S. 687 (1966). We therefore conclude that the $10,000 paid to Mr. Sears is not properly includable in petitioner's income. It appears from the record that the advance of $17,000 made to Mr. Eisenhauer was for expenses for himself and the crew primarily on the round-the-world trip. It would appear that the hourly cost of $2,000 for operating the plane should include the expenses of the pilot and the crew. Although the record is not as clear as it might be, Mr. Richardson testified that if the $17,000 was actually used for crew expenses it should have been included in the cost of operating the plane. On the basis of the record as a whole, we conclude that this $17,000 is not properly includable in petitioner's income.
Most of the remaining items consist of the $68,000 of advances which petitioner drew during the year for travel expenses, the $6,820.98 of American Express card charges and the $487.91 Diners Club charges paid for petitioner by ICC. To the extent that these *228 amounts were actually expended for the benefit of ICC or IOS they are corporate expenses properly paid by the corporations. To the extent the amounts were not expenses for the benefit of the corporations they represent income to petitioner. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 743-744 (1973).
We have concluded in discussing the use of the 707 that a number of petitioner's trips were for business purposes and therefore have charged no amount of the plane's operating costs of these trips to petitioner. We have also concluded that certain of the trips in the plane were primarily personal even though petitioner did transact some business in connection with these primarily personal trips. To the extent the advances received by petitioner and the charges to his American Express card were for his own hotel, meals and other incidental expenses in connection with his official travel or business entertaining for ICC or IOS, they would not be includable in petitioner's income. However, we note that on many of the trips which we concluded were business trips for petitioner, he was accompanied by Mrs. Vesco and on some of them was accompanied by his children. *229 Any of the advances to petitioner used to pay expenses of Mrs. Vesco or petitioner's children or charges for this purpose which were paid for petitioner by ICC would represent income to petitioner. Any expenses on the trips we have held to be primarily personal which were not directly related to the minimal business activities which petitioner conducted would be personal expenses of petitioner and as such would constitute income to him from payment of his personal expenses by ICC. Again using our judgment and applying the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), we conclude that one-half of the $10,000 advance to petitioner on September 2, one-half of the October 20 advance to petitioner of $5,000, one-half of the $10,000 advance of December 15, one-half of the American Express bills payments of $6,820.98 and one-half of the Diners Club payment of $487.91 on December 21, 1971, are properly includable in petitioner's income and the other one-half of these items represent proper business expenses of petitioner for business of ICC or IOS. On the same basis we conclude that one-fourth, or $5,000, of the November 4 advance of $20,000 constituted proper *230 business expenses of petitioner and the other $15,000 was in payment of personal expenses of petitioner and constituted income to him. We conclude on the same basis that one-fourth, or $750, of the $3,000 advance on November 8 constituted business expenses and the balance, or $2,250, constituted personal expenses of petitioner paid by ICC and is includable in his income. [16]
The December 23 advance of $20,000 appears to be in connection with the primarily personal trip taken *231 by the Vesco family on December 26, 1971. The record does show that petitioner withdrew $10,000 from his personal funds for this trip and that he paid directly to a travel agency for the Safari $2,000 from his personal account. However, the record shows that petitioner had with him on this trip Mrs. Vesco, the four Vesco children, three of the friends of the Vesco children and Ms. Bailey. In other words, there were nine persons in addition to petitioner on the trip for whom petitioner was paying expenses. Also, the amount of expenses which petitioner might have had in connection with the small amount of business he may have conducted in Beirut and Nairobi is difficult to determine. Certainly less than one-tenth of the total cost of the trip would be for business purposes since petitioner conducted little business as it was primarily a vacation trip for him. Again, exercising our best judgment, we have concluded that $1,000 of the $20,000 advance was a proper business expense of petitioner and the other $19,000 was properly includable in petitioner's income. There are a few items included in the $170,621.06 which we have not discussed since the record does not contain sufficient *232 information as to the payments to determine what they were for. The largest of these are plane rental cost of $675 and a Moody's Investor's subscription of $200. In our view the Moody's Investorhs subscription is by its nature a normal business-related expense of a person in petitioner's position. We hold this $200 is not income to petitioner. For lack of evidence in the record, we hold the plane rental cost of $675 and the items we have not discussed are properly includable in petitioner's income. The next issue concerns an amount of $28,170.58 which was included in petitioner's income as representing unexplained bank deposits. Initially a much larger amount was included but all except this amount was explained. Our findings effectively disposed of all the items of unexplained bank deposits except the $25,000 composed of two checks from Bank Cantrade in Switzerland. As shown by our findings, we concluded that the $1,004.73 which came from a check of Mr. Clay's and the $545 which came from a similar check were repayments of loans and not income to petitioner. The three checks totaling $280 received by petitioner from the rental of a stall on his property were obviously income *233 to petitioner, as were the two $200 checks for a total of $400 from the Powdermilk Lodge. The only remaining items besides the $25,000 is a deposit of $400 received from an individual by the name of Marty Solomon. The nature of this amount is not explained and on that basis we conclude that it also constituted income to petitioner. The record shows that the $25,000 was a transfer to petitioner from the Bank Cantrade in which petitioner kept an account in Switzerland. The indication from the record is that this account was kept to deposit to petitioner's account amounts received from Executive Financial. The record shows, as set forth in our findings with respect to petitioner's investment in Executive Financial, that on February 24, 1970, petitioner transferred $90,000 of funds to Bank Cantrade, Zurich, Switzerland. The two checks which were deposited to petitioner's account in New Jersey from Bank Cantrade totaling $25,000 were deposited on February 17, 1971. In our view there is sufficient evidence in the record to indicate that these receipts from Bank Cantrade were connected with petitioner's investment in or advances to Executive Financial, A.G. and its subsidiaries or *234 were amounts advanced to him by the bank and repaid out of the $90,000 transfer to the bank on February 24, 1970. On the basis of the record as a whole, we conclude that this $25,000 represents a repayment or return to petitioner of part of his investment in or loans to Executive Financial, A.G. and is not properly includable in petitioner's income. The record with respect to petitioner's claimed loss from Executive Financial, A.G. is very confusing. We have found on the basis of Mr. Anderson's testimony the amount that he paid on June 29, 1970, to that bank was an investment in or loan to Executive Financial. While the $32,500 transferred to the Standard Commerz Bank, Lucerne is stated to be for the account of Executive Services, A.G., it is difficult to understand why any advance would be made for the account of this entity after all its assets had been sold except its investment in Standard Commerz Bank. We have not overlooked the testimony of petitioner's accountant, Mr. Bloom, or the testimony by deposition of Mr. Strickler that Mr. Strickler made a computation of the total investment in and loans to Executive Financial by Mr. Anderson and petitioner and that by deducting *235 Mr. Anderson's investment and loans the amount of petitioner's investment and loans were arrived at. However, we have made no finding based on this testimony. The document from which Mr. Bloom testified was a document given to him by Mr. Strickler and Mr. Bloom himself could in no way vouch for the document. Mr. Strickler's testimony was that the figures came from certain records of Executive Financial. However, we do not place any confidence in Mr. Strickler's testimony with respect to the figures. We did not admit the copy of the purported schedule into evidence. In our view, if an individual who was responsible for keeping the books of an operation could not break down investments and loans between two individuals who were supposed to be investing on the basis of one-third by one and two-thirds by the other, he would not properly allocate between advances and reimbursements and other items. The only information in this record which we consider worthy of belief with respect to petitioner's investment in and loans to Executive Financial, A.G. are the checks written by him to Executive Financial, A.G. and the fund transfers which were marked as transfers for the account of Executive *236 Financial, A.G. or one of its subsidiaries such as Executive Services, A.G. We conclude from this record that petitioner's investment in and loans to Executive Financial, A.G. and its subsidiaries did not exceed $312,900. Mr. Bloom and Mr. Strickler both testified that petitioner received back from Executive Financial $302,000. There is no credible support in the record for this figure and petitioner may well have received substantially more from Executive Financial. We have in effect considered the $25,000 of checks from Bank Cantrade to be a further receipt by petitioner from Executive Financial. No explanation is made why petitioner received all the funds of Executive Financial and Mr. Anderson received nothing. On the basis of this record we conclude that petitioner did not sustain a loss in connection with his investment in and loans to Executive Financial, A.G. and its subsidiaries, and we so hold.
We note also that, accepting Mr. Anderson's testimony, only $20,000 of the amount petitioner put into Executive Financial, A.G. was an investment and that the remainder of his advances were loans. The testimony of Mr. Strickler and Mr. Bloom is that all assets of Executive *237 Financial, A.G. and its subsidiaries had been disposed of prior to December 31, 1970. The funds from these dispositions had been paid over to petitioner. Mr. Strickler specifically testified that after the sale of its interest in Standard Commerz Bank, Executive Financial was without assets and was worthless. There is some testimony in the record that petitioner sold his stock in Executive Financial in 1971. What would be the value of stock in a corporation with absolutely no assets is not shown. We recognize that in some situations there could be some good will attached to the name of a corporation which would give some value to the stock even though it had no other assets. However, from the testimony in this record as to the difficulties encountered by Executive Financial, A.G., it is hard to see how this would be the situation here. Certainly any loan made by petitioner to Executive Financial would have been worthless before the end of 1970. We do of course have a claimed carryover in this case, but no evidence with respect to how the claimed carryover was arrived at has been offered in this case. [17] On the basis of this record as a whole we sustain respondent's disallowance *238 of the capital loss claimed by petitioner in connection with his investment in Executive Financial, A.G. and his claimed carryover loss. The final issue here is whether respondent properly determined that petitioner was liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. The burden is on petitioner to show error in respondent's determination in this respect. Pritchett v. Commissioner,63 T.C. 149, 174 (1974), and cases there cited. In our view, not only has petitioner failed to show error in respondent's determination but the record shows negligence on the part of petitioner in not including in income some amounts he received which clearly were income, such as the amounts from rental of stables and from Powdermilk Lodge, and other income he received by payment of his personal obligations *239 by ICC. Some of the items paid for petitioner by ICC were so clearly personal expenses of petitioner's that he could not have thought their payments by ICC were not income. Such items as taxes on his home and costs of work on his home he certainly knew could not be proper business expenses. In our view there are also numerous other indications of negligence on the part of petitioner in connection with the return he filed for 1971. For instance, there is insufficient explanation of how the claimed loss on Executive Financial was computed. We conclude that a part of the underpayment of tax which will result from our holding in this case is due to negligence. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
*. Proper addition: $133,192.88↩
2. Respondent in his reply brief conceded that Flights 22, 25, 26, 27, 28, 40, 44, 45 and 48 were flights taken by petitioner in connection with the business of ICC and IOS.↩
3. At the trial respondent conceded that a portion of these items were not income to petitioner, leaving in issue only the amount of $28,170.58.↩
4. Petitioner's 1971 return reported the amount with respect to the capital loss from Financial Executive, A.G. as follows: Long-term Capital Gains and Losses--Assets Held More Than 6 Months
[SEE TABLE IN ORIGINAL]↩
5. Petitioner argues that respondent's determination is arbitrary and capricious since respondent's counsel did not supply petitioner with the records of ICC. Petitioner argues that respondent's counsel was directed by the Court to supply these records to petitioner and failed to do so. Of course the actions of respondent's counsel at trial would have no bearing on the question of whether the notice of deficiency was arbitrary since the notice was issued long before the trial. Furthermore, petitioner is in error in his interpretation of the Court's direction to respondent's counsel and the compliance by counsel with that direction. Respondent's counsel was directed by the Court to supply petitioner with schedules his agents had taken from the records of ICC that formed the basis of the determinations made in the notice of deficiency to petitioner in this case and with any copies of records of ICC in their possession. The record will show that respondent's counsel supplied the records that they considered to be required by the Court's direction. Thereafter petitioner's counsel argued that not all the required records had been supplied and the Court had respondent's counsel furnish to the Court the entire reports and work papers of his agents not only in connection with petitioner's tax liability for 1971 but in connection with the investigation of the tax liability of ICC. After looking at these records the Court required respondent's counsel to supply certain additional information to petitioner and specifically ruled that respondent's counsel had complied with the direction of the Court. The record is clear that respondent's files contained no copies of underlying documents contained in ICC's files but rather contained only schedules made by respondent's agents from the books and records of ICC and certain notations which came from the underlying invoices and other documents in the files of ICC. Several witnesses during the course of the trial testified that insofar as they knew the underlying documents which respondent's agents had seen at ICC were still available in the records of ICC. During the course of the trial it was suggested to petitioner's counsel that if he wanted the records of ICC produced in court he could subpoena these records from the appropriate officer of ICC. There is no indication that petitioner ever subpoenaed the records of ICC and the clear indication from the record is that he did not.↩
6. An accountant who was one of petitioner's representatives during the audit testified that the revenue agent brought a special agent of the Intelligence Division into the audit before any of petitioner's records had been supplied to the revenue agent, and when the special agent was brought in all discussions by representatives of petitioner with respondent's agent were discontinued. ↩
7. Petitioner argues that the notice of deficiency is arbitrary and capricious on its face since respondent in determining the 1971 tax liability of ICC disallowed only $64,550.43 of that corporation's claimed business expense deductions for travel and entertainment, whereas $170,621.06 of such items paid by ICC to or for petitioner was determined to be includable in petitioner's income. We made no findings that respondent had disallowed only $64,550.43 of claimed travel and entertainment expenses in his determination of the tax liability of ICC for a number of reasons. First, such a finding would be totally immaterial. Secondly, the document from which the $64,550.43 was taken was an agent's report and there has been no showing that the final determination made by the Commissioner with respect to ICC's tax liability for 1971 incorporated unchanged this figure from the agent's report. Finally, the record is absolutely clear, and we have found, that a high percentage of the $170,621.06 which respondent included in petitioner's income as personal items paid to or for petitioner by ICC was reimbursed to ICC by IOS. When ICC received a reimbursement from IOS for an amount paid to or for petitioner there should be no deduction taken for the item by ICC on its return and therefore no claimed deduction to disallow. Petitioner has totally failed to show that ICC claimed any deduction on its 1971 Federal income tax return for any portion of the $170,621.06 which was included in petitioner's income by respondent for 1971.↩
8. Section 6013(e) does not apply unless there is an omission of gross income in excess of 25 percent of the gross income reported. Petitioner contends that there was no omission of gross income. It is therefore necessary to determine the issues raised as to the merits of respondent's adjustment in order to determine if this requirement of section 6013(e) is met regardless of our conclusion with respect to whether Mrs. Vesco meets the other requirements of that section. Also, one of the issues here involves a disallowance of a claimed capital loss and capital loss carryover. Section 6013(e) does not entitle a spouse under any circumstances to relief from liability of any portion of the deficiency resulting from an erroneous deduction claimed on the return. Allen v. Commissioner,61 T.C. 125, 132↩ (1973).
9. The record contains copies of several Telex communications. One of these dated December 13, 1971, to Mr. David Lund at ILI-UK in London from Ms. Bailey states that petitioner has requested that she obtain "the exact names and addresses of the operations in Kenya." The reply states that the resident sales manager in Nairobi is George Lord but that Mr. Lord travels often. Mr. Lund suggested that petitioner contact Ray Cuthbert. There is also in the record a copy of a Telex with a note under date of December 16, 1971, to Ms. Bailey which states that attached is a copy of a Telex which a Mr. George Pulver sent to George Lord.The copy of the Telex reads in part: TO: George Lord Robert Vesco and party of 11 arriving Nairobi 27th or 28th via aeroplane staying at New Stanley. * * * I understand Vesco will be spending a day or two in Nairobi at the beginning and end of his pleasure visit to several east African countries. We have given him your address and telephone number and he presumably will be contacting you.↩
10. There are a number of Telex communications in the record obtaining "the best" or the "Presidential" suite at deluxe hotels in Bangkok, Singapore, Hong Kong and Japan. Also, there are communications with respect to dinner engagements "to include the ladies." The tenor of these communications is the possible transaction of some business while on a pleasure trip.↩
11. A schedule of approximate flight hours of the 707 in 1971 was testified to by Mr. Richardson. We do not completely understand this schedule and therefore have made no finding based on it. However, if we do properly interpret it, the total hours flown as shown on the schedule in 1971 is 386, which also supports the $2,000 an hour estimate. ↩
12. The only other evidence in the record from which we could make any judgment with respect to the cost to be charged to petitioner for the various flights would be the exhibit put in by petitioner showing the charges for first class air transportation between various points in the year 1971. Using this exhibit and considering the number of passengers on the plane for petitioner's personal benefit, we arrive at approximately $26,000 as the cost of first class air fare for the number of persons who traveled to the various places we have found that petitioner used the plane for personal purposes. However, we agree with respondent that the use of a private plane for travel at a person's own discretion has a far greater fair rental value than first class air fare.It is the fair rental value of the plane for the time it was used personally by petitioner which is properly includable in his income.See Estate of Runnels v. Commissioner,54 T.C. 762, 767↩ (1970). This fair rental value we have determined from the record to be $90,000.
13. In discussing the "fringe benefit" issue as regards the incidental occupancy of seats in the 707 by petitioner's wife and children, we recognize that respondent has over the years successfully maintained that employees can realize taxable income from the direct, nonincidental use of property by the employee or members of his or her family or from employer reimbursement of personal expenses of such persons. See e.g., Challenge Manufacturing Co. v. Commissioner,37 T.C. 650 (1962); Silverman v. Commissioner,28 T.C. 1061 (1957), affd. 253 F.2d 849↩ (8th Cir. 1958).
14. Because of petitioner's positions with ICC and IOS, payment of his personal expenses by either of these corporations could be amounts improperly obtained by him from the corporations and for this reason income to him, see James v. Commissioner,366 U.S. 213, 219 (1961), or additionalcompensation to him or a preferential dividend from ICC even though ICC may have obtained reimbursement for the expenditures from IOS. There is no showing in this record that ICC did not have earnings and profits with which to pay a dividend in 1971. See Bailey v. United States,415 F. Supp. 1305, 1307-1308↩ (D. N.J. 1976), for a recitation of the actions against petitioner and the default judgment obtained against him in 1973 by ICC. However, this record indicates that most of the items of the type here involved questioned by ICC were for the year 1972 because of the reimbursements received by ICC from IOS for 1971.
15. Because of the length of the stipulated schedule of payments determined by respondent to have been made on petitioner's behalf by ICC (Exh. 10-J), we have not set it forth in full in our findings. This schedule is, however, a part of our findings since we have found the facts as stipulated. We will therefore refer to items on this schedule in our opinion.↩
16. We have not overlooked the testimony in the record that petitioner was a "free spender," that he usually paid with cash and when he was present would rarely permit anyone else to pay a bill for a meal. This testimony, however, does not help in determining what portion of the amounts petitioner spent were for business-related purposes and what portion for personal purposes. The record shows that on several trips petitioner took friends of his children along with Mrs. Vesco, Ms. Bailey and his children. Spending on Mrs. Vesco, his children and his children's friends is clearly personal. Also, the record shows that at least some of the amounts spent on Ms. Bailey were personal expenses of petitioner.↩
17. We are aware that there is pending before this Court another case, Docket No. 7408-74, of this same petitioner for the year 1970. However, no information has been offered in the present case with respect to how the carryover from 1970 claimed by petitioner in connection with his 1971 return was computed.↩